T.C. Memo. 2008-224

UNITED STATES TAX COURT

RICHARD S. MILLER AND SANDRA R. ERICKSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

RICHARD S. MILLER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 19703-06, 19749-06.    Filed October 2, 2008.

<u>Ronald L. Mountsier</u>, for petitioners.

<u>Catherine S. Tyson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  In these consolidated cases respondent determined the following deficiencies:[1]

---

[1] In 2002 and 2003 petitioner Richard S. Miller's filing status was single.  Petitioner Miller married petitioner Erickson in 2004.

Richard S. Miller and Sandra R. Erickson:

| Year | Deficiency |
| --- | --- |
| 2004 | $51,262 |

Richard S. Miller:

| Year | Deficiency |
| --- | --- |
| 2002 | $37,997 |
| 2003 | 48,884 |

The issue for decision is whether petitioners' horse breeding activity was an activity not engaged in for profit pursuant to section 183.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time they filed the petition, petitioners resided in Florida.

In 1979 Mr. Miller purchased Electric Pump & Tool Services (Electric Pump). When Mr. Miller purchased Electric Pump, it had sales of $400,000 and 10 employees. At the time of trial Mr. Miller had increased the sales of Electric Pump to $23 million and increased its employees to 80. At the time of trial Mr. Miller had expanded Electric Pump to six offices throughout the country. Mr. Miller received $444,231, $395,014, and $420,597 in

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

2002, 2003, and 2004 in salary from Electric Pump, respectively. At various times Mr. Miller has been in the pay phone business, the hog slaughter and breeding business, and the spent-hen (chickens that no longer produce eggs) business. Mr. Miller has also owned real property which he rented out.

In 1989 Mr. Miller purchased his first Paso Fino horse. Paso Fino horses have a smooth gait which enables riders to have a smooth ride. Shortly after purchasing his first Paso Fino Mr. Miller joined the Paso Fino Horse Association (PFHA). In either 1990 or 1991 Mr. Miller became a board member of the PFHA and later served on the executive committee and as treasurer. Mr. Miller began attending PFHA conventions in 1995. Mr. Miller also attended instructional clinics and seminars on topics such as advertising and trail riding.

From 1989 until 2002 Mr. Miller conducted his horse activities from his home and farm in Van Meter, Iowa. In 1990 Mr. Miller had a horse barn built on the Iowa property, and in or around 1992 a hay shed was built.

Initially Mr. Miller entered his horses in show competitions in the northern United States. During this period Mr. Miller's horses were trained in Minnesota. Mr. Miller was successful at the northern shows; but when he attempted to compete at a national show, his horses were unable to compete with the horses

that were trained in Southern States such as Florida, Georgia, and Louisiana, home to the industry's top trainers.

In June 2002 Mr. Miller purchased approximately 16 acres of property in Ocala, Florida, and moved some of his horses from Iowa to Florida. Some of the horses were already in Florida. Ocala, Florida, advertises itself as the "Horse Capital of the World". One of the main reasons that Mr. Miller moved his horses to Florida and bought the property in Ocala was that it was near trainer Jorge Suarez. Mr. Suarez is a noted trainer and rider of Paso Fino horses and along with his three brothers runs a farm called 4Js. Mr. Suarez is from Puerto Rico and was involved with Paso Fino horses in Puerto Rico before coming to the United States. Mr. Miller met Mr. Suarez in 1989 and was impressed with Mr. Suarez's riding ability. Mr. Suarez has a reputation as one of the top five Paso Fino riders in the world. Mr. Miller consults with Mr. Suarez on buying and selling horses and would not buy a horse without having Mr. Suarez see it first. In 2005 Mr. Miller moved to Fort Myers, Florida, which is approximately 216 miles from his farm in Ocala.

Beginning in 2002 and continuing in 2003, 2004, 2005, and 2006 Mr. Miller filed a Schedule C, Profit or Loss From Business, listing his principal business as "show horse breeding". In 2002 Mr. Miller reported losses of $95,571 on his Schedule C. In 2003 Mr. Miller reported losses of $126,377 on his Schedule C and

losses of $9,223 on Form 4797, Sales of Business Property. In 2003 Mr. Miller sold three horses at a loss. In 2004 Mr. Miller reported Schedule C losses of $139,098 and losses of $13,742 on Form 4797. In 2004 Mr. Miller sold one horse at a loss.

Ms. Erickson kept financial records for the breeding activity listing income and expenses. In addition to Ms. Erickson's records, Mr. Miller registered his horses with the PFHA, which maintained records concerning the performance of specific horses at horse shows, recording earnings and placement. The PFHA certificate also traces the horse's bloodlines. As a lifetime member of the PFHA, Mr. Miller had access to the PFHA information 24 hours a day through the Internet.

When Mr. Miller decided to run his horse activity as a business, he had a business plan but did not commit it to writing. Mr. Miller began with three mares, Picaedia, Marcia, and Romana, and some stallions, including Guayacan. Mr. Miller's plan was to have excellent mares, breed them, and raise the foals to about 3 years old before putting a saddle on them. By the time the horses were 3 years old, Mr. Miller expected they would appreciate in value. There are three types of Paso Fino horses: Fino, pleasure, and performance. Fino horses are the most profitable of the three. Mr. Miller modified his initial business plan because he realized that his mares were not good enough to give birth to excellent Fino horses. Additionally, Mr.

Miller encountered unexpected setbacks with some of his horses. Marcia always produced twins, which are undesirable in the Paso Fino horse industry.  Mr. Miller incurred increased veterinary bills to "pinch off" one ovary every time Marcia was bred so that Marcia delivered only one offspring.  Mr. Miller also used an embryo transfer on Marcia which cost approximately $4,000. Guayacan, which Mr. Miller paid $30,000 for in 2002, came with high expectations.  Guayacan turned out not to be an athlete and got lazy, and Mr. Miller decided to geld him.  In 2004 Mr. Miller sold Guayacan for $2,000.

Another horse, Amarissa IA, broke her hoof kicking her stall at age 4.  After spending $5,000 on veterinary bills to heal Amarissa IA, Mr. Miller hoped that she could gait properly because she would not be worth much without a proper gait.  Mr. Miller also had to euthanize a 5-day-old foal because of an arthritic condition.

Separate and apart from the horses Mr. Miller kept as part of his business, Mr. Miller used a personal horse named Artillero Maraco.  Mr. Miller did not claim deductions with respect to Artillero Maraco except to the extent of show winnings.  Mr. Miller did not ride his other horses for pleasure purposes.  Ms. Erickson does not ride at all.  Mr. Miller's farm is a working farm and has no living quarters.

Mr. Miller used various methods to advertise his horses. Mr. Miller advertised in magazines, handed out brochures at shows, listed his farm in the PFHA farm directory, and had business cards. In addition to paid advertisements, Mr. Miller received considerable publicity when his horses were successful at events.

In addition to consulting with Mr. Suarez, Mr. Miller uses various veterinarians for his horses. Among the veterinary doctors Mr. Miller consults with are Dr. Jose Diava, who Mr. Miller uses for horse reproduction issues, and Dr. James Wright, a horse bone and muscle specialist who also handles most of Mr. Miller's routine veterinary needs.

In 2002 when Mr. Miller decided to convert his horse activity into a business, he began keeping activity logs. Mr. Miller spent over 1,000, 800, and 800 hours on the horse activity in 2002, 2003, and 2004, respectively. Mr. Miller was involved in all aspects of the horse activity except cleaning the stalls.

In 2006 Mr. Miller's sales of horses totaled $110,700, up from $15,500 in 2002. Mr. Miller had a profit in 2006 of $16,693. In 2007 Mr. Miller's sales totaled $95,000. As of December 31, 2006, the estimated fair market value of Mr. Miller's horses was $318,000, with a basis of $34,384. Mr. Miller had a basis of $155,753 in the Ocala farm, including the

addition of a fence.  The property was appraised in May 2007 at $534,000.

OPINION

Generally, the Commissioner's deficiency determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of showing the determinations are in error.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  There are exceptions to this rule.  Section 7491(a) shifts the burden of proof to the Commissioner with respect to a factual issue affecting the tax liability of a taxpayer who meets certain preliminary conditions.  This case is decided on the preponderance of the evidence and is not affected by section 7491(a).

Section 183(a) provides generally that if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b).  Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

A taxpayer who is carrying on a trade or business may deduct ordinary and necessary expenses incurred in connection with the operation of the business.  Sec. 162(a).  The U.S. Court of Appeals for the Eleventh Circuit, to which an appeal in this case

would lie, has held that an activity constitutes a "trade or business" within the meaning of section 162 if the taxpayer's actual and honest objective is to realize a profit. Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-519.

The expectation of profit need not have been reasonable; however, the taxpayer must have entered into the activity, or continued it, with the objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); sec. 1.183-2(a), Income Tax Regs.

Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's mere statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in

carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  This list is nonexclusive, and the number of factors for or against the taxpayer is not necessarily determinative, but rather all facts and circumstances must be taken into account, and more weight may be given to some factors than to others.  Id.; see Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).

Manner in Which the Activity Is Conducted

The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit objective.  Sec. 1.183-2(b)(1), Income Tax Regs.  The evidence established that Mr. Miller kept complete and accurate records and that he operated the horse breeding activity in a businesslike manner.

Mr. Miller had a business plan for the horse breeding activity.  See Phillips v. Commissioner, T.C. Memo. 1997-128 (holding that a business plan need not be in written form and can be evidenced by the taxpayer's actions).  Mr. Miller's longtime accountant Dennis Mueller testified that Mr. Miller's records were organized and compared favorably with the records Mr. Miller

kept in his other business ventures and those that others maintained in livestock and farm businesses. Mr. Mueller credibly testified that Mr. Miller never gets into a business without the intention of making a profit. When Mr. Miller decided to turn his horse breeding activity into a business, he had three mares and a plan to breed horses that would appreciate in value. Mr. Miller suffered setbacks with his mare Marcia because she always produced twins, which are undesirable in the Paso Fino horse community. As a result his costs increased because he decided to use embryonic transfers, an expensive procedure. Mr. Miller wanted to breed Fino quality horses but realized that his mares were not good enough. Consequently, he had to modify his approach in order to reach his goal of breeding Fino horses. When Mr. Miller started conducting his activities as a business, his plan was to have valuable horses after a few years because the horses would have to mature before they appreciated in value.

Mr. Miller registered his horses with the PFHA. The PFHA maintained records of a horse's bloodlines and show results. These records were available online to Mr. Miller at all times because he was a life member of the PFHA.

Another factor that demonstrates that Mr. Miller conducted his horse activities in a businesslike manner is that he advertised his horses in a variety of ways. Mr. Miller

advertised in magazines, listed his farm in the PFHA directory, and handed out fliers at shows, and Mr. Miller and his wife had business cards. Additionally, Mr. Miller's attendance and successful participation at horse shows provided publicity to a wide audience.

We conclude that this factor indicates that petitioners had the requisite profit motive.

Expertise of the Taxpayer and His Advisers

A taxpayer's expertise, research, and study of an activity, as well as his consultation with experts, may be indicative of a profit intent. Sec. 1.183-2(b)(2), Income Tax Regs. Mr. Miller purchased his first Paso Fino in 1989 and joined the PFHA shortly after. Mr. Miller used Mr. Suarez, a highly respected rider and professional trainer of Paso Fino horses, as his trainer. Mr. Suarez is considered one of the top five Paso Fino riders in the world. Mr. Miller purchased the farm in Ocala because of its proximity to Mr. Suarez. Mr. Miller did not buy a horse unless Mr. Suarez had seen the horse. If Mr. Miller and Mr. Suarez disagreed over a horse, Mr. Suarez's viewpoint prevailed because Mr. Miller recognized that Mr. Suarez had more expertise.

In addition to his association with Mr. Suarez, Mr. Miller used experienced veterinarians. Dr. Diava was a specialist in reproductive issues, and Dr. Wright was a muscle and bone specialist.

We conclude that this factor is indicative of the requisite profit motive.

## The Expectation That Assets May Appreciate in Value

In 2002 when Mr. Miller decided to turn his horse breeding activity into a business, his goal was to breed horses that would appreciate in value after about 3 years. As of December 31, 2006, Mr. Miller's horses were valued at $318,000 with a basis of $34,384. The unrealized gain in the horses indicates that they have appreciated in value.

In addition to the horses, the value of Mr. Miller's farm appreciated in value. Mr. Miller purchased the farm in 2002 for $10,000 per acre. Including the addition of a fence, Mr. Miller's basis in the land was $155,753. A comparative market analysis performed in May 2007 indicated that the land was worth approximately $534,000, or $32,000 per acre.

Respondent argues that the values of the horses and the farm are inflated and based on Mr. Miller's unreliable estimates. The value of the land is based on a comparative market analysis performed by Clayton Fell of Triple Crown Realty. Although the value of the horses was provided by Mr. Miller on the basis of his consultations with Mr. Suarez, respondent provided no credible evidence that the value of the horses was erroneous.

We conclude that this factor is indicative of the requisite profit motive.

The Taxpayer's Success in Similar or Dissimilar Activities

Mr. Miller is a successful businessman. He purchased Electric Pump in 1979 with sales of $400,000 and 10 employees. At the time of trial Electric Pump had $23 million in sales and 80 employees. Additionally, Mr. Miller has been successful in the real estate business. Although these businesses are dissimilar to horse breeding, their growth demonstrates Mr. Miller's business acumen and ability to develop and improve businesses. Mr. Miller also has experience in the spent-hen business as well as raising hogs for both slaughter and breeding. The hog business has some similarities with the horse business but is not entirely similar. The record shows that Mr. Miller is a successful entrepreneur who is not afraid to take risks.

We conclude that this factor is indicative of the requisite profit motive.

History of Income or Loss

In the years at issue Mr. Miller had cumulative losses of $384,011. Some of the losses are the result of unexpected setbacks Mr. Miller suffered. By 2006, a year not at issue, Mr. Miller had sales of $110,000 and a profit of $16,693. Respondent argues that the decrease in losses is due only to a decrease in expenses. We disagree. Mr. Miller initially tried to breed Fino quality horses but realized he did not have the mares to do so and was selling "pleasure" and "performance" quality horses. He

made an effort to improve his stable and to be able to sell Fino quality horses. Mr. Miller encountered unexpected setbacks with some of his horses. Because Marcia always produced twins, which are undesirable in the Paso Fino horse industry, Mr. Miller had to "pinch off" one ovary every time Marcia was bred. As a result Marcia delivered only one offspring, but Mr. Miller had increased veterinary bills. Mr. Miller used an embryo transfer on Marcia which cost approximately $4,000. Guayacan, which Mr. Miller paid $30,000 for in 2002, came with high expectations. Guayacan turned out not to be an athlete and got lazy, and Mr. Miller decided to geld him. In 2004 Mr. Miller sold Guayacan for $2,000.

When she was 4 years old Amarissa IA started kicking the stall and broke her hoof. After spending $5,000 on veterinary bills to heal Amarissa IA, Mr. Miller can only hope that she can gait properly because she is not worth much without a proper gait. Mr. Miller also had to euthanize a 5-day-old foal because of an arthritic condition. Expenses also decreased in 2006 because Mr. Miller did not have the type of setbacks he had had in previous years.

A record of substantial losses over several years may be indicative of the absence of a profit motive. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Section 1.183-2(b)(6),

Income Tax Regs., however, provides that a series of losses during the startup phase of an activity may not necessarily be an indication that the activity is not engaged in for profit.

This Court has recognized that the startup phase of a horse breeding activity is 5 to 10 years. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979). We believe that the years in issue, 2002 through 2004, encompassed a startup period. See Phillips v. Commissioner, T.C. Memo. 1997-128; see also Engdahl v. Commissioner, supra at 669. As Mr. Miller's losses were sustained as a result of unforeseen setbacks and during the startup phase of the horse breeding activity, we conclude that the losses sustained are not an indication that the horse breeding activity was not engaged in for profit.

Financial Status of the Taxpayer

A lack of income from sources other than the activity in question may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity in question, particularly if offset by substantial tax benefits, may indicate the activity is not engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs.

Mr. Miller received a substantial salary from Electric Pump and received income from other sources as well. During the years

at issue Mr. Miller received average annual wages of $432,166[3] from Electric Pump. Without the claimed losses from the horse breeding activity Mr. Miller's income would have been higher. Although this factor may indicate that Mr. Miller lacked a profit motive, it is but one factor and is not determinative of the outcome. Additionally, Mr. Mueller testified that Mr. Miller did not enter into a business without the expectation and intent to make a profit.

Elements of Personal Pleasure and Time and Effort Expended

The absence of personal pleasure or recreation relating to the activity in question may indicate the presence of a profit objective. Sec. 1.183-2(b)(9), Income Tax Regs. The mere fact that a taxpayer derives personal pleasure from a particular activity does not, per se, demonstrate a lack of profit motive.

At all relevant times Mr. Miller kept a personal horse and did not claim deductions related to the horse except to the extent of show winnings related to the horse. Additionally, Mr. Miller's wife does not ride at all. Mr. Miller's farm is a working farm and has no living quarters.

Mr. Miller participated in all aspects of the breeding activity except cleaning the stalls, and he spent a substantial amount of his time on the breeding activity. Mr. Miller spent over 1,000, 800, and 800 hours on the horse activity in 2002,

---

[3] This number is rounded to the nearest dollar.

2003, and 2004, respectively. Mr. Miller spent a significant amount of time traveling to horse shows where he interacted with others in the industry and also advertised his breeding activity. Additionally, Mr. Miller hired competent people to assist in carrying on the horse breeding activity.

We conclude that this factor is not indicative of the lack of a requisite profit motive.

<u>Conclusion</u>

The evidence established that Mr. Miller maintained adequate records, operated the horse breeding activity in a businesslike manner, consulted with horse experts including a renowned trainer, expended a significant amount of time on the horse breeding activity, had a reasonable expectation that the assets used in the activity would appreciate in value, and had success in other businesses, some of which are loosely related to horse breeding. Furthermore, Mr. Miller sustained the losses in issue during the startup phase of the horse breeding activity and partly from unforeseen circumstances. Accordingly, we conclude that Mr. Miller engaged in the horse breeding activity during 2002, 2003, and 2004 with the actual and honest objective of making a profit and section 183 is inapplicable in this case.

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decisions will be entered for</u>

<u>petitioners</u>.