T.C. Memo. 2009-220


UNITED STATES TAX COURT


MARCIA TRESCOTT HELMICK AND ROBERT P. HELMICK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13713-06.                    Filed September 22, 2009.


        Ps ran a horse-breeding and -boarding operation in
which they kept and cared for as many as 60 horses on
the same property as their personal residence.  Ps had
no full-time employees and did most of the work
themselves, and they did not use the horses for
personal pleasure.  Ps intended to make a profit to
supplement their income, but, over a number of years,
they incurred a string of losses.  The only substantial
income Ps had from other sources was P-H's modest
salary as a county employee, against which they applied
the losses.

        <u>Held</u>:  On the basis of all the facts and
circumstances, the horse-breeding and -boarding
operation was an activity engaged in for profit under
I.R.C. sec. 183 in the years 1993 to 2002.

Marcia Trescott Helmick and Robert P. Helmick, pro sese.

M. Jeanne Peterson, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, Judge:  The Internal Revenue Service (IRS) issued to petitioners Marcia Trescott Helmick and Robert P. Helmick a statutory notice of deficiency on April 11, 2006, pursuant to section 6212,[1] showing the IRS's determinations of the following deficiencies in income tax and accompanying failure-to-file additions to tax and accuracy-related penalties under sections 6651(a)(1) and 6662,[2] respectively, for tax years 1997 to 2002:

---

[1]Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code of 1986 (26 U.S.C.), as amended, and all citations of Rules refer to the Tax Court Rules of Practice and Procedure.

[2]Respondent concedes that the $2,133.50 failure-to-file addition to tax under section 6651(a)(1) for 2001 was overstated by $150 in the notice of deficiency and seeks an addition of only $1,983.50 for that year.  Respondent concedes that the $1,614.75 failure-to-file addition to tax under section 6651(a)(1) for 2002 was overstated by $1,291 in the notice of deficiency and seeks an addition of only $323.75 for that year.  Respondent concedes that the $1,925.40 accuracy-related penalty under section 6662 for 2001 was overstated by $120 in the notice of deficiency and seeks a penalty of only $1,805.40 for that year.

| Tax Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662 |
|----------|-----------|-------------------------------|-------------------|
| 1997 | $4,114 | $1,028.00 | $822.80 |
| 1998 | 5,861 | 1,383.50 | 1,172.20 |
| 1999 | 6,371 | 1,465.50 | 1,274.20 |
| 2000 | 6,446 | 1,440.50 | 1,289.20 |
| 2001 | 9,627 | 2,133.50 | 1,925.40 |
| 2002 | 7,598 | 1,614.75 | 1,519.60 |

The issue for decision is whether the Helmicks' horse-breeding and -boarding operation (hereinafter, the horse activity) was an activity engaged in for profit pursuant to section 183. We find that the Helmicks' horse activity was engaged in for profit.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation of facts filed September 10, 2008, and the attached exhibits are incorporated herein by this reference. Trial of this case was held in Denver, Colorado, on September 10, 2008. Ms. Helmick and Mr. Helmick testified. Mr. Helmick, in particular, was a candid and credible witness. Ms. Helmick, though given to some overstatement (e.g., about the number of hours she worked and the quantum of records she maintained), was believable as to the gist

of her testimony.[3]  Respondent called no witnesses.  At the time that they filed their petition, the Helmicks resided in Colorado.

Initial Horse Activity

In or around 1980, Ms. Helmick (then known as Marcia L. Trescott) and Richard E. Taylor acquired a roughly 1-1/2 to 2 acre parcel of real estate in a primarily residential neighborhood in Niwot, Colorado, a town in Boulder County about 9 miles from the city of Boulder, Colorado.  She conducted a small horse activity on that property before her marriage to Mr. Helmick in the mid-1980s.  After the Helmicks married, the property was transferred to Ms. Helmick and Mr. Helmick as tenants in common, and Mr. Helmick joined in the conduct of the horse activity on that property.  Beginning no later than July 1986 and continuing through all the tax years at issue, the Helmicks' primary residence was a house located on the same property on which they conducted their horse activity.

_____

[3]For purposes of disputing Ms. Helmick's credibility, respondent asks the Court to take judicial notice of a document that she filed in bankruptcy court, in which she stated that, after the trial in this case, the Court "ruled from the bench * * * that the IRS was wrong to have attempted, at any time, to characterize the farm as a hobby"; but respondent points out that there is no such ruling in the trial transcript of this case. However, the Court did speak to the parties off the record, observing that the Helmicks' horse activity did not appear to be a mere "hobby", and that the disallowance of section 183 (though sometimes referred to as the "hobby loss" provision) reaches more than hobbies and disallows losses unless the activity is entered into for profit.  Ms. Helmick's statement does not accurately characterize the Court's actual comment, but it is not (as respondent argues) an "outright fabrication".

- 5 -

<u>The Helmicks' Horse Activity</u>

The Helmicks' horse activity principally involved the breeding and boarding of horses. The Helmicks' boarding activity consisted of keeping horses belonging to third parties on their property, and caring for and feeding those horses for a fee. The Helmicks' horse-breeding activities consisted of acquiring purebred Arabian stallions and mares for the purpose of breeding them with each other in order to produce and raise offspring for sale. These breeding activities began in earnest in 1984 when Ms. Helmick purchased SS Bay Moun, a 2-year-old Arabian purebred stallion, for $30,000. Although Ms. Helmick had physical custody of SS Bay Moun, the horse's previous owners refused to transfer clear title. As a result, Ms. Helmick could not register the horse or its offspring as purebred Arabians, and the Helmicks lost some sales. In response, the Helmicks filed a lawsuit in 1985, which remained pending for 9 years, to obtain clear title to SS Bay Moun in order to register the horse and its offspring as purebred Arabians and thus to increase their value on the equine market. In 1994, at the conclusion of the litigation, the Helmicks acquired clear title to SS Bay Moun.

The Helmicks' horse activity began with a focus on breeding horses to create salable livestock, but that focus shifted to boarding horses when the Helmicks concluded that breeding was less profitable because of a perceived decline in sale prices for

purebred Arabian horses in the 1980s and 1990s. The Helmicks also believed that boarding horses would become increasingly profitable for them because of their property's favorable zoning status, discussed below, which gave them a virtual monopoly on boarding horses in Niwot, Colorado.

From 1993 to 2002 Ms. Helmick typically spent her entire work week conducting the horse activity. Mr. Helmick, who worked full time as a land-use planner for Boulder and Larimer Counties, typically worked on the horse activity in early mornings and evenings, and on weekends. Conducting the horse activity involved, inter alia, buying and transporting hundreds of pounds of feed each week, mucking stalls, shoveling hay, caring for sick horses, and guiding pregnant mares through the birthing process. In fact, the Helmicks frequently had to watch over their pregnant mares during the night as well as the day. On occasion during the foaling season--which extended from January to April--the Helmicks would have to take turns staying awake at night to ensure that one of them checked on the mares at least once each hour. The strenuous nature of the work took its toll on the Helmicks. Mr. Helmick suffered from a bad back, which sometimes left him bedridden, and Ms. Helmick tore her shoulder.

The Helmicks never hired full-time employees, but they would occasionally hire part-time assistants--usually high school students--to help them with the horse activity. Mr. Helmick had

a daughter (who was not Ms. Helmick's daughter) who was born in 1981 and of whom he had joint custody. However, the daughter did not live with Mr. Helmick and seldom stayed with him during the weekends when he had visitation rights, because she did not enjoy cleaning stalls or doing other work in connection with the horses. We find that Mr. Helmick's daughter did not spend a material amount of time working with or riding the horses.

The Helmicks' History of Other Employment and Business Ventures

From 1993 to 2002 Ms. Helmick was not otherwise employed or involved in business ventures aside from the horse activity. Furthermore, Ms. Helmick does not allege, nor does the record show, that she was ever involved in any other business ventures.[4]

Mr. Helmick worked full time as a land-use planner for Boulder County from 1980 to 1994 and for Larimer County from 1995 through all of the tax years at issue. His salary for that job during 1998 to 2002 never exceeded $65,000. Neither he nor Ms. Helmick had any other substantial sources of income during 1993 to 2002. From 1995 to 1996 Mr. Helmick also ran his own part-time, private land-use consulting business, which he referred to as "Action Consulting". This business had a total of six clients over its brief existence, but Mr. Helmick speculated at trial

---

[4]Ms. Helmick alleged that she entered the business of horse breeding and boarding through her "business associations" with "rural equine residential real estate". However, she did not allege that she was involved in a real estate business, nor did she describe what that business might entail.

that because of the business's low overhead it was "probably" profitable.  Mr. Helmick ultimately closed Action Consulting because he preferred the "regular paycheck and benefits" from his work with county governments to the uncertain cashflow associated with private consulting.  Mr. Helmick does not allege, nor does the record show, that he was ever involved in any other business ventures.

The Helmicks' Property and Zoning Status

From 1997 to 2000 the number of horses (both owned and boarded) on the Helmicks' property in Niwot ranged from 40 to 60. At any given time during that period, the Helmicks owned between 40 and 70 percent of the horses on their property.  Those horses were kept in a barn with 13 stalls inside and an outdoor arena for exercise.  In or around 1994 the Helmicks made plans to improve their property by adding to their house and barn and constructing an indoor riding arena, and they took out a construction loan for that purpose.  The Helmicks believed that these improvements and additions to their property would make their boarding activities--to which their focus was shifting-- more profitable by lowering labor costs (because it is easier to clean indoor facilities than outdoor facilities where horses exercise, particularly during inclement weather) and by increasing the fees they could charge (because they could offer more amenities, like the indoor riding arena).

However, these improvements were delayed by an adverse determination by Boulder County, which held that the Helmicks were in violation of zoning law and would have to reduce the number of horses kept on their property. The Helmicks responded by engaging in a several-months-long campaign to challenge Boulder County's determination, which effort included soliciting clients and friends to testify on their behalf. Before 1997 they won the right to continue to have 40 horses on their property, which was then zoned as an equestrian center. However, the Helmicks were required to keep a minimum of 40 horses on their property to maintain its status as an equestrian center in their primarily residential neighborhood. If they kept fewer than 40 horses on the property, then the number of horses they were entitled to keep on their property would decrease correspondingly. Moreover, if the Helmicks completely failed to maintain their property's status as an equestrian center, then they would be permitted to keep only two horses. The zoning situation thus imposed on them, in effect, a downward ratchet that required them to maintain the size of their herd or incrementally lose their right to run the horse activity.

The Helmicks began construction on the additions to their house and barn and on the indoor riding arena in 1997 after winning their zoning dispute with Boulder County. However, because of a dispute with the contractor whom the Helmicks hired

to construct the indoor riding arena, the proposed construction of that arena ceased in the late 1990s after the foundation was built, and the arena was never finished. The Helmicks sued the contractor and ultimately settled the lawsuit in 2001 for $5,000.

Expertise of the Helmicks and Their Advisers

The Helmicks were largely self-taught in the running of the horse activity, but by 1993, the Helmicks each had over 8 years of experience in breeding and boarding horses on their property. In addition, the record shows that Mr. Helmick was a member of the board of directors of various professional horse-breeding and -boarding associations--including the Colorado Horsemen's Council, and the Boulder County Horsemen's Association--at various times during 1993 to 2002.

The Helmicks were classified as amateur owners in the equine industry, i.e., they were not professionally qualified or compensated as horse trainers, and any training they performed was incidental to their breeding and boarding operation. The Helmicks were not veterinarians. However, the Helmicks consulted numerous veterinarians with respect to their horse activity. In particular, the Helmicks occasionally employed a veterinarian to inspect their mares to determine the appropriate time to breed them in order to increase the likelihood of conceiving a mare instead of a stallion, because at the time, mares would fetch a higher price on the equine market. In the late 1980s the

Helmicks discontinued the use of veterinarians for this purpose to save themselves and their clients the cost of veterinarian's fees. By that time Mr. Helmick had become proficient enough to inspect the mares himself and achieve a success rate of influencing the sex of the colt that was lower than the veterinarian's rate but still above the norm.

The Helmicks' Books and Records

Ms. Helmick was responsible for the bookkeeping for the horse activity. She did not prepare any contemporaneous business plans or financial statements for the horse activity. However, Mr. Helmick would give the receipts generated by the horse activity to Ms. Helmick, and after they had accumulated for some time, she would enter them into a Quicken or QuickBooks program on their computer. In response to pointed questions, Ms. Helmick's testimony was equivocal on whether she made her Quicken entries promptly or delayed doing so for months or years. We therefore find that Ms. Helmick delayed making her Quicken entries for months or years after she received the receipts from Mr. Helmick. The Helmicks used Quicken to generate summaries of their income and expenses for, inter alia, preparing their Forms 1040, U.S. Individual Income Tax Return, and dealing with IRS audits.

At trial the Helmicks did not present the receipts as evidence to corroborate their income or expenses for the tax

years at issue.  However, the Helmicks introduced evidence of their practice of saving their receipts and creating computer-generated records therefrom in the form of the Quicken summaries of their source and use of funds for all six of the tax years at issue, and we find their testimony, corroborated with those summaries, to be credible.  However, they did not show that they kept sufficiently current with their Quicken entries to enable them to determine at any given moment the amount of their current deficit.

Losses From the Helmicks' Horse Activity

The Helmicks' horse activity generated losses every year at least after Mr. Helmick became involved with the activity in late 1984 or 1985.  On Schedules F, Profit or Loss From Farming, attached to their Forms 1040 for the six years at issue (1997-2002) and the five previous years (1992-96), the Helmicks deducted a string of losses from their horse activity, as listed below, totaling approximately $400,000 (and averaging about $36,000 per year).

However, for purposes of evaluating the Helmicks' profit motive for persisting in the horse activity, those losses may be somewhat misleading in two respects.  First, the Schedule F expenses that gave rise to those reported losses included a portion of the mortgage interest expense and tax that the IRS's notice of deficiency allowed as additional itemized expenses.

The Helmicks would have incurred these expenses, and could have deducted them, whether or not they had engaged in the horse activity. Second, the Schedule F expenses included depreciation on assets that the Helmicks had previously purchased and which therefore did not represent current costs of running the activity. On the one hand, the prospect of claiming the tax benefit of such depreciation could be a tax-related, non-profit-related motive for undertaking the activity. But on the other hand, a person who already owned the asset might well disregard depreciation in making a decision as to whether he could hope to turn a profit from the activity and as to how long he could afford to incur losses before turning the corner. In this case the evaluation of the Helmicks' profit motive should include a reckoning of the actual out-of-pocket, marginal loss generated by the horse activity that reduces the Schedule F losses by the depreciation, taxes, and interest. When that reduction is made, the marginal loss of the activity is shown to have been on average about $27,000 per year, i.e., more modest than the Schedules F would seem to indicate:

| Year | Schedule F Loss | Depreciation | Interest | Taxes | Marginal Loss |
|------|-----------------|--------------|----------|-------|---------------|
| 1992 | $57,034 | --- | --- | --- | --- |
| 1993 | 57,315 | --- | --- | --- | --- |
| 1994 | 28,544 | --- | --- | --- | --- |
| 1995 | 23,608 | --- | --- | --- | --- |
| 1996 | 9,561 | --- | --- | --- | --- |
| 1997 | 29,783 | [1]$6,947 | -0- | -0- | $22,836 |
| 1998 | 34,847 | 6,947 | $6,091 | $612 | 21,197 |
| 1999 | 41,174 | 6,206 | 6,419 | 1,858 | 26,691 |
| 2000 | 32,584 | 4,894 | 2,501 | 588 | 24,601 |
| 2001 | 28,023 | 3,789 | 6,150 | 52 | 18,032 |
| 2002 | 57,896 | 6,402 | 2,094 | 11 | 49,389 |
| Total | 400,369 | | | | 162,746 |

[1]Because the 1997 Form 1040 is not in the record, we use the 1998 depreciation figure as an approximation.

## Post-Suit Year Operation of the Horse Activity

The Helmicks married in the mid-1980s and remained married through all of the tax years at issue. However, the Helmicks separated in 2003, and their divorce was accompanied by contentious litigation. In the course of that litigation, some of the Helmicks' assets were divided. On October 2, 2007, the divorce court ordered Ms. Helmick to vacate the house and property in Niwot, where she and Mr. Helmick had lived together and conducted the horse activity. Neither of the parties alleges, nor does the record show, the exact date on which the Helmicks concluded their horse activity. However, the record does show that the Helmicks' separation in 2003 and subsequent litigation precipitated the end of that activity.

At trial Ms. Helmick testified that the receipts that she and Mr. Helmick saved to substantiate their income and expenses from the horse activity should still be located in the house in Niwot.  Ms. Helmick also testified that those receipts are inaccessible to her because she would be arrested if she returned to the house in violation of the divorce court's order.  However, Mr. Helmick testified with equal conviction that he had been unable to find the receipts after he "went through the house with a fine-toothed comb."  Mr. Helmick also testified that he had "no knowledge of where * * * [the receipts] are" today, but he is certain that they must have existed "because * * * [the Helmicks] constructed the tax returns from those records."  On the basis of the Helmicks' testimony, we find that the Helmicks unintentionally lost their receipts in the disruption of the horse activity that resulted from their divorce.

Notice of Deficiency

The Helmicks failed to timely file their Forms 1040 for tax years 1997 through 2002, because they believed there was no tax due for those years, as a result of the losses from their horse activity.  However, the Helmicks did eventually file those forms late with the IRS over the course of 2003, reporting losses from the horse activity and claiming net operating loss carryovers

generated by the horse activity in previous years.[5]  On April 11,

2006, the IRS mailed the Helmicks a notice of deficiency for tax

years 1997 through 2002, which disallowed the losses from their

horse activity as so-called hobby losses from an activity not

engaged in for profit pursuant to section 183.  The notice of

deficiency also disallowed net operating loss deductions carried

forward from their horse activity for the tax years at issue and

---

[5]The Helmicks' Forms 1040 bear apparent discrepancies, but they seem to show that, as of the beginning of the year 1997, the Helmicks had accumulated net operating losses of $28,792, available to be carried forward and used as deductions. Schedule 1 to the notice of deficiency bears a similar figure of $29,762, and we assume this to be the correct figure.  The schedules attached to the Helmicks' Forms 1040 for 1998 through 2002 seem to reflect that those forms include claimed deductions of net operating loss carryforwards; but in that respect they seem to be in error:  If the Helmicks' Schedule F losses are allowed for the six years in issue, then for the five years 1997, 1998, 1999, 2000, and 2002, their Forms 1040 reflected overall net losses after subtracting from their wage income and tax refund income (a) their Schedule F losses, (b) their itemized deductions, and (c) their exemptions.  Those net losses so computed were $1,930 in 1998, $4,131 in 1999, $5,103 in 2000, and $11,375 in 2002.  Using figures from Schedule 1 to the IRS's notice of deficiency, similar results are obtained by subtracting "Net Operating Loss Deduction" from "Taxable income as Shown in return as Filed".  The return for 1997 is not in the record, but using the figures from Schedule 1 in the notice of deficiency, the net loss for 1997 was $15,275.  Thus, the Helmicks did not need to deduct any NOL carryforwards in order to have zero taxable income in those five years.  The one exception was 2001, in which they did apparently need an NOL deduction of $17,161 in order to have zero taxable income.  The net losses from 1997 through 2000 total $26,439, and if carried forward they would be sufficient to offset the 2001 income.  Thus, if the Helmicks' Schedule F losses are allowable, as we find they are, then the suit-year losses are sufficient to eliminate all their taxable income for all of the years in suit, and carryforwards from the pre-suit years 1992 to 1996 are immaterial.

tax years 1993 to 1996, and determined failure-to-file additions to tax and accuracy-related penalties under sections 6651(a)(1) and 6662.  In response to the notice of deficiency, the Helmicks petitioned this Court, pursuant to section 6213(a), to redetermine their deficiencies.

OPINION

At issue is the Helmicks' entitlement to deductions for tax years 1997 to 2002 arising from their horse activity during tax years 1993 to 2002.[6]  A taxpayer who is carrying on a trade or business may deduct ordinary and necessary expenses incurred in connection with the operation of the business.  Sec. 162(a).  However, a taxpayer generally may not deduct expenses incurred in connection with a hobby or other non-profit activity to offset taxable income from other sources.  Sec. 183(a).[7]  We find that the Helmicks' horse activity, though unprofitable, was engaged in with the intention of making a profit during tax years 1993 to

---

[6]Only tax years 1997 to 2002 are at issue.  However, it is well settled that we may determine the correct amount of a net operating loss for a tax year not at issue (whether or not the assessment of a deficiency for that year is barred) as a preliminary step in determining the correct amount of a net operating loss carryover to a tax year at issue.  See sec. 6214(b); Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 440 (1974) (citing ABKCO Indus., Inc. v. Commissioner, 56 T.C. 1083, 1088-1089 (1971), affd. 482 F.2d 150 (3d Cir. 1973)), affd. without published opinion 510 F.2d 970 (3d Cir. 1975).

[7]Section 183(a) provides generally that if an activity is not engaged in for profit, no deduction attributable to that activity shall be allowed except as provided in section 183(b).

2002. Although their intention to make the activity eventually profitable was objectively unreasonable, it was their genuine subjective intention. By the time of the years in issue, the Helmicks had invested so much time and effort in this failing activity that they could see no way out except to somehow make the thing work. No other possible purpose explains their willingness to persist in an activity that had become so frustrating and unpleasant. Therefore, the Helmicks are entitled to deduct their expenses and net operating losses from that activity for those years.

A.  Burden of Proof

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of showing the determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Since the IRS determined that the Helmicks' horse activity was not engaged in for profit, that determination is presumed correct, and the Helmicks have the burden to prove otherwise.

B.  Activities Not Engaged In for Profit

Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." An activity constitutes a "trade or business" within the meaning of section

162--and it escapes the limitation of section 183--if the taxpayer's actual and honest objective is to realize a profit. Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-519. The expectation of profit need not have been reasonable; however, the taxpayer must have entered into the activity, or continued it, with the objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); sec. 1.183-2(a), Income Tax Regs (26 C.F.R.). Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's mere statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs.

The stereotypical abusive scenario involving horse breeding is the wealthy businessman who runs a real business during the week--with business records, income projections, accountability to banks and investors, and so on--and owns a "gentleman's farm" as a weekend retreat where he keeps horses for the recreation of himself and his family and friends. He dabbles in breeding horses, with no expectation of ever making a profit, so that he can deduct the expenses of his horses and thereby have Uncle Sam subsidize the weekend farm. However, some horse-related

operations are actually engaged in for profit.  See, e.g., <u>Miller v. Commissioner</u>, T.C. Memo. 2008-224.  The Helmicks' horse activity does not fit the stereotypical abusive scenario; instead they engaged in the horse activity with a motive to make a profit, and they are therefore entitled to deduct their losses.

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective:  (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  This list is nonexclusive, and the number of factors for or against the taxpayer is not necessarily determinative.  Rather, all facts and circumstances must be taken into account, and more weight may be given to some factors than to others.  <u>Id.</u>; see <u>Dunn v. Commissioner</u>, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).

We now address these nine factors.

C.    Analysis of the Helmicks' Horse Activity

1.    Manner in Which the Activity Is Conducted

The fact that a taxpayer carries on the activity in a business-like manner and maintains complete and accurate books and records may indicate a profit objective.  Sec. 1.183-2(b)(1), Income Tax Regs.  A change of operating methods, adoption of new techniques, or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit objective.  Id.  Respondent emphasizes the Helmicks' failure to prepare contemporaneous business plans or financial statements, which in some circumstances might indeed be a sign that a serious profit objective is lacking.  However, respondent concedes that the Helmicks retained their receipts from the horse activity and subsequently entered them into a Quicken or QuickBooks program on their computer.  The record shows that the Helmicks kept records in an unprofessional and disorganized manner that would have satisfied no prospective investor, but the Helmicks were not seeking or accounting to any investor.  For the Helmicks it was enough to know that the business was not turning a profit (not yet, as they thought of it), and their shoebox record keeping was adequate for their purpose.

While the Helmicks had no written business plan for their horse activity, the evidence established that they did have a

rudimentary plan, which was to weather their current losses while maintaining the value of their herd and keeping at least 40 horses on their property in order to preserve that property's favorable zoning status as an equestrian center. See Phillips v. Commissioner, T.C. Memo. 1997-128 (holding that a business plan need not be in written form and can be evidenced by the taxpayer's actions). This zoning status gave the Helmicks a virtual monopoly on boarding horses in Niwot, Colorado, and they hoped eventually to exploit this competitive advantage for a profit by shifting their focus from horse breeding to boarding. In line with this plan, the Helmicks sought to lower their labor costs and increase the boarding fees they could charge by significantly improving their boarding facilities. In 1997 the Helmicks began to construct an indoor riding arena as well as additions to their house and barn. Respondent correctly notes that the indoor riding arena was never completed. However, the Helmicks did construct the foundation for the indoor riding arena, and the project ceased only because of a dispute with the contractor they hired to build that arena. The record shows that the Helmicks were sincere about upgrading their facilities.

Respondent disputed the adequacy of the Helmicks' books and records for substantiation of their expenses under section 6001. The Helmicks' practice of merely retaining their receipts and subsequently quantifying them was indeed informal. However, the

practice was sufficient to keep the Helmicks apprised of their cash on hand and expenses, which in turn was sufficient for their purpose of weathering their current losses to achieve monopoly profits in the future.

As respondent correctly notes, the Helmicks did not present the receipts as evidence to corroborate their income or expenses for the tax years at issue. However, "[i]t is well established that the Tax Court may permit a taxpayer to substantiate deductions through secondary evidence where the underlying documents have been unintentionally lost or destroyed." Davis v. Commissioner, T.C. Memo. 2006-272 (citing Boyd v. Commissioner, 122 T.C. 305, 320-321 (2004), Malinowski v. Commissioner, 71 T.C. 1120, 1125 (1979), Furnish v. Commissioner, T.C. Memo. 2001-286, Joseph v. Commissioner, T.C. Memo. 1997-447, and Watson v. Commissioner, T.C. Memo. 1988-29). As is set out above, the Helmicks unintentionally lost their receipts from the horse activity in the course of Ms. Helmick's relocation and the litigation that arose from their divorce. Thus, the Helmicks will be permitted to substantiate their expenses from that activity through secondary evidence. We find the Helmicks' testimony that they retained their receipts from the horse activity and subsequently entered them into the computer database of their Quicken program--corroborated with printouts of Quicken summaries of their source and use of funds derived from those

receipts--to be credible.  We therefore hold that the Helmicks kept adequate records to substantiate their expenses from the horse activity for tax years 1993 to 2002.

Notably, the Helmicks spent 9 years, from 1985 to 1994, suing for clear title to SS Bay Moun, the purebred Arabian stallion they purchased to jumpstart their horse-breeding activity.  The Helmicks always had the possession and use of the horse, and they always enjoyed any pleasure that such possession and use might bring.  However, without a clear title, neither the horse nor its offspring could be registered or sold as purebred Arabians.  This caused the Helmicks to lose sales, because registered horses are more valuable on the equine market.  Thus, it necessarily follows that the lawsuit to register SS Bay Moun was motivated not by personal pleasure but by a desire to increase profits and weighs in favor of the Helmicks.  See Miller v. Commissioner, T.C. Memo. 2008-224 (listing registration of horses as a fact that weighed in favor of finding that a horse breeder carried on his activity in a business-like manner).

We conclude that this factor--the manner in which the activity is conducted--is mixed:  partly in respondent's favor, but overall in the Helmicks' favor, indicating that they had the requisite profit objective.

2.    Expertise of the Taxpayers and Their Advisers

A taxpayer's expertise, research, and study of an activity, as well as his consultation with experts, may indicate a profit objective.  Sec. 1.183-2(b)(2), Income Tax Regs.  By 1993 the Helmicks had modest relevant expertise:  Each had over 8 years of experience in breeding and boarding horses on their property, and Mr. Helmick had served on the board of directors of various professional horse-breeding and -boarding associations.  In addition, the Helmicks hired veterinarians to assist them with their horse breeding from time to time, and Mr. Helmick became proficient at horse breeding by observing their practices. Respondent acknowledges all of these facts but still contends that the Helmicks failed to demonstrate that they consulted "economic experts or developed any personal economic expertise" in the business of horse breeding and boarding.  It is true that the record does not show that the Helmicks consulted "economic experts".  However, Mr. Helmick's tangential expertise as a career land-use planner enabled him to recognize generally the value of the favorable zoning status of the Helmicks' property-- and fueled his hope to leverage that status into monopoly profits.

We conclude that this factor--expertise--is neutral for assessing whether the Helmicks had the requisite profit objective.

3.  Time and Effort Expended

The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate a profit objective.  Sec. 1.183-2(b)(3), Income Tax Regs.  As respondent concedes, the mere fact that the Helmicks kept and cared for over 40 horses on their property proved the Helmicks spent some time and effort in their horse activity--particularly in light of the fact that the Helmicks never hired any full-time employees.  The record shows much more than respondent concedes.  Ms. Helmick was not otherwise employed from 1993 to 2002 and typically spent her entire work week in the conduct of the horse activity.  Mr. Helmick also credibly testified to the fact that he devoted his early mornings, his evenings, and his weekends to the conduct of the horse activity. The Helmicks clearly spent very substantial amounts of time in the horse activity.  This time was spent not riding horses or attending horse shows but rather performing the dawn-to-dusk labor--often grueling and strenuous labor--of mucking stalls, shoveling hay, caring for sick horses, and guiding mares through the birthing process.  The Helmicks' estimates of the hours they spent seem overstated, but they also seem sincere, reflecting the fact that their work was exhausting and--as profits failed to materialize--discouraging.  We attribute their exaggerations not

to deliberate dishonesty but to a lack of perspective that resulted from their immersion in taxing and disappointing toil.

We conclude that this factor--time and effort--is strongly in the Helmicks' favor and indicates that they had the requisite profit objective.

4. The Expectation That Assets May Appreciate in Value

A taxpayer's expectation that assets used in the activity may appreciate in value and generate an overall profit may indicate a profit objective. Sec. 1.183-2(b)(4), Income Tax Regs. An overall profit is present if net earnings and appreciation are sufficient to recoup the losses sustained in the "intervening years" between a given tax year and the time at which future profits were expected. See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Respondent correctly notes that the Helmicks' horse activity sustained losses from no later than 1985 through at least 2002, but respondent seems to assume that the requisite profit motive as of any given year must involve an expectation that even all past losses will be recouped, so that the activity will have generated a net profit over its entire course. This position distorts the notion of profit motive for purposes of section 183.

If a natural disaster caused the death of 90 percent of a rancher's herd and resulted in a catastrophic loss that could

never be recouped, but the rancher thereafter expected to generate an overall prospective profit by breeding and selling the remaining 10 percent of his herd on a foregoing basis, then he could not be said to lack a profit objective after the disaster merely because he would never recoup the prior loss. Likewise, even assuming arguendo that the Helmicks could never recoup their losses from years prior to 1997, if they expected to generate an overall profit from 1997 onward, then they cannot be said to lack a profit objective with respect to those later years merely because they would never recoup their losses from years prior to 1997. Rather, the Helmicks meet their burden as to any year for which they show that they expected eventually to recoup losses sustained in the "intervening years" (to use the phrase from Bessenyey) between the current year and the hoped-for profitable future. Thus, we must determine, as of each of the relevant years, whether the Helmicks expected their horse activity to generate an overall profit between that year and the time at which future profits were expected.

The Helmicks' long-term goal was to profit from (i) creating a self-perpetuating herd of purebred Arabian horses that would increase in value over time, and (ii) maintaining their property's favorable zoning status as an equestrian center in the middle of an otherwise residential neighborhood. In determining whether the possibility of an overall profit is present, we take

into account the appreciation of both the herd and the zoning status, because they were both assets that were used in the horse activity.[8]

Respondent correctly notes that "a vague and unauthenticated notion" that assets used in the Helmicks' horse activity were appreciating in value does not constitute a bona fide expectation that appreciation would be sufficient to recoup the losses sustained during the intervening years. La Musga v. Commissioner, T.C. Memo. 1982-742. However, the Helmicks credibly testified that if they had liquidated their entire herd, they would have suffered a "monstrous loss". Furthermore, the favorable zoning status of the Helmicks' property was contingent on keeping at least 40 horses on that property. If the Helmicks liquidated their herd and ceased to keep horses on their property, then they would lose that zoning status. While the Helmicks are not appraisers, their estimate that preserving the value of their herd and the favorable zoning status would eventually yield an overall profit was plausible and--more

_____

[8]The regulations provide that "all the facts and circumstances" must be taken into account to determine the activity or activities of the taxpayer. Sec. 1.183-1(d)(1), Income Tax Regs. Because of the close nexus between the horse activity and the zoning status, i.e., the zoning status was both dependent on and necessary for the conduct of the activity, there is no doubt that the zoning status was an asset used in the activity--not in a separate real estate investment activity. See Keanini v. Commissioner, 94 T.C. 41, 46 (1990).

pertinent here--was their genuine subjective assessment of the value that their horse activity was generating and would continue to generate.

We conclude that this factor--expectation that assets may appreciate--is in the Helmicks' favor and indicates that they had the requisite profit objective.

5.    <u>The Taxpayers' Success in Similar or Dissimilar Activities</u>

Even if an activity is unprofitable, the fact that a taxpayer has previously converted similar activities from unprofitable to profitable enterprises may indicate a profit objective with respect to the current activity. Sec. 1.183-2(b)(5), Income Tax Regs.  The Helmicks do not allege, nor does the record show, that either of them was ever involved in a similar and profitable business venture.  From 1995 to 1996 Mr. Helmick ran a part-time, private land-use consulting business that had at total of six clients over its brief existence. However, the record does not show whether this business was profitable.  Nor does it show any similarities between that business and the horse activity.

We conclude that this factor--success in similar or dissimilar activities--is in respondent's favor.

6.  <u>History of Income or Loss</u>

An important consideration is the taxpayer's history of income or losses related to the activity.  Sec. 1.183-2(b)(6), Income Tax Regs.  A record of substantial losses over several years may be indicative of the absence of a profit motive. <u>Golanty v. Commissioner</u>, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).  In the tax years at issue, and in prior years, the Helmicks claimed an impressive string of losses from their horse activity on their Forms 1040. In the eleven years from 1992 through 2002, the Helmicks claimed a total of over $400,000 of losses.

Section 1.183-2(b)(6), Income Tax Regs., provides that a series of losses during the startup phase of an activity may not necessarily be an indication that the activity is not engaged in for profit.  However, this Court has recognized that the startup phase of an American horse-breeding activity is 5 to 10 years. <u>Engdahl v. Commissioner</u>, 72 T.C. 659, 669 (1979).  Since the Helmicks ran their horse activity for no less than 8 years before 1993 and 12 years before the tax years at issue, we conclude that their horse activity was not in its startup phase and this exception does not apply.

We conclude that this factor--history of income or loss--is in respondent's favor.

7.    Amount of Occasional Profits

The amount and frequency of occasional profits earned from the activity may indicate a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs.  Respondent correctly notes that the Helmicks' horse activity sustained an unbroken string of losses from no later than 1985 through at least 2002. See id.  Moreover, the record does not show that the Helmicks' horse activity was ever profitable.

We conclude that this factor--occasional profits--is in respondent's favor.

8.    Financial Status of the Taxpayers

A lack of income from sources other than the activity in question may indicate a profit objective.  In contrast, substantial income from sources other than the activity in question, particularly if offset by substantial tax benefits, may indicate the activity is not engaged in for profit.  Sec. 1.183-2(b)(8), Income Tax Regs.  The Helmicks did not have any substantial income aside from Mr. Helmick's salary as a land-use planner for Boulder and Larimer Counties, which never exceeded $65,000 during 1998 to 2002.  In fact, even without the losses from the horse activity, the Helmicks' total taxable income during that period would never have exceeded $50,000 in any year,

and their marginal tax rate would never have exceeded 28 percent.[9]

It is true, as respondent notes, that section 183 does not apply just to "wealthy individuals", Ranciato v. Commissioner, T.C. Memo. 1996-67; and taxpayers with modest tax liabilities can have a motive to shelter those liabilities. However, "the wealth of an individual is a fact to consider in determining the applicability of section 183." Id. The Helmicks' income tax liability would have been higher without the claimed losses from the horse activity, and the tax deficiencies calculated by the IRS for the six years in issue total just over $40,000. However, the Helmicks' middle-class status meant that they could not afford to maintain the horse activity simply for pleasure if there was no hope of future profit. The Helmicks were not wealthy individuals whose unprofitable activities would suggest an effort to shelter unrelated income with anticipated losses. We do not find it credible that the Helmicks would keep and care for 40 to 60 horses on their property for the purpose of sheltering the modest salary of a public servant.

---

[9]The notice of deficiency shows that, according to the IRS's computations, the Helmicks' highest taxable income was in 2002, in the amount of $49,733. Married individuals filing jointly with taxable income in that amount had a marginal tax rate of 28 percent in the years in issue. See sec. 1(a).

We conclude that this factor--financial status--is in the Helmicks' favor and indicates that they had the requisite profit objective.

9.   Elements of Personal Pleasure

The absence of personal pleasure or recreation relating to the activity in question may indicate a profit objective. Sec. 1.183-2(b)(9), Income Tax Regs.  Respondent contends that the Helmicks "concede that they took personal pleasure in their horse breeding and boarding activity."  First, as respondent correctly notes, "[t]he mere fact that a taxpayer derives personal pleasure from a particular activity does not, per se, demonstrate a lack of profit motive."  Miller v. Commissioner, T.C. Memo. 2008-224.

Second, respondent supports his contention that the Helmicks took personal pleasure in their horse activity with snippets of their testimony that are not fair to their context.  In particular, respondent notes that "Mr. Helmick liked 'rubbing the nose of a nice, warm, furry creature'."  Mr. Helmick made that statement in the context of explaining his profit objective and the hard physical nature of keeping and caring for a herd of horses:

> the business was intended to ultimately supplement the income, not to dodge paying taxes.

> And, yes. I guess I enjoyed it at times.  You know, rubbing the nose of a nice, warm, furry creature is

> good.  The number of days I was laid up with a bad back
> or other things from moving all that feed are clearly
> probably not items of personal pleasure.

On the basis of the record and the testimony cited by respondent, we find that the Helmicks derived little personal pleasure from the horse activity.  The record does not show that riding horses was the Helmicks' hobby.  Nor does the record show that the Helmicks used their horses to entertain family or friends.  In fact, Mr. Helmick's daughter often declined to visit him during the weekends in order to avoid working with the horses.

Ultimately, respondent contends that the Helmicks kept and cared for dozens of horses on their property--without the help of any full-time employees--solely for their personal pleasure. Respondent further contends that the Helmicks contested Boulder County's adverse determination that their horse activity violated zoning law only so that they could continue to enjoy taking care of those horses.  If the Helmicks had paid a staff to handle the day-to-day chores of the horse activity, and they had merely visited the horses, it might be credible to assert that they enjoyed maintaining a large herd.  However, we cannot find on the facts that the Helmicks derived so much pleasure from the company of purebred Arabian horses that they were willing to spend all of their free time and lose thousands of dollars every year to maintain a herd on the same property as their personal residence. Even if the Helmicks had failed to maintain their property's

zoning status as an equestrian center, they would still have been entitled to keep two horses on their property.  If pleasure had been the goal, then keeping and caring for 2 horses--rather than 40--would seem to have been preferable.

We conclude that this factor--elements of personal pleasure--is in the Helmicks' favor and indicates that they had the requisite profit objective.

## Conclusion

We conclude that the Helmicks engaged in their horse activity during tax years 1993 to 2002 with the actual and honest objective of making a profit, and that section 183 is inapplicable in this case.[10]

To reflect the foregoing,

Decision will be entered for

petitioners.

---

[10]Since we hold that section 183 is inapplicable in this case and the Helmicks are entitled to deductions for their losses from their horse activity, it follows that the Helmicks are not liable for the failure-to-file additions to tax and the accuracy-related penalties that the IRS determined in its notice of deficiency under sections 6651(a)(1) and 6662.