T.C. Memo. 2010-216

UNITED STATES TAX COURT

JOHNNY L. DENNIS, JR. AND JENNIE DENNIS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6403-06, 23978-06.    Filed October 5, 2010.

<u>Donald J. Dombrowski</u>, for petitioners.

<u>Sara D. Trapani</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  By notices of deficiency[1] dated January 3, 2006, for the tax year 2001 and August 21, 2006, for the tax years 2002 and 2003 respondent determined the following

---

[1]On Nov. 24, 2004, petitioners executed Form 872, Consent to Extend the Time to Assess Tax, consenting to extend the time for respondent to assess their tax for the tax year 2001.

deficiencies in income tax and penalties for the respective
taxable years:

|       |            | Penalty   |
| Year  | Deficiency | Sec. 6662 |
|-------|------------|-----------|
| 2001  | $30,836    | $5,122.60 |
| 2002  | 39,246     | 7,849.20  |
| 2003  | 66,241     | 13,248.20 |

Petitioners timely filed their petitions contesting the 2001,
2002, and 2003 income tax deficiencies and penalties.  The Court
must decide whether petitioners have engaged in their horse
breeding activity with the intent of making a profit within the
meaning of section 183.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Johnny L. Dennis, Jr. (Mr. Dennis), and Jennie Dennis (Mrs.
Dennis) are husband and wife, who timely filed joint Federal
income tax returns for the tax years 2001, 2002, and 2003.  When
the petitions were filed,[3] they resided in Texas.

---

[2]Unless otherwise indicated, all Rule references are to the
Tax Court Rules of Practice and Procedure, and all section
references are to the Internal Revenue Code in effect for the
years in issue.

[3]On Nov. 21, 2009, the Court granted respondent's motion to
consolidate the cases for trial, briefing, and opinion.

Petitioners' Profiles

Mr. Dennis was born in Galena Park, Texas, near the Houston Ship Channel.  In 1956 his family moved to Magnolia, Texas, and lived on a 2-acre farm, where they milked their own cows, raised their own chickens, and rode their one horse.  In contrast, Mrs. Dennis was raised in Chicago, Illinois.  Before engaging in the horse breeding activity, Mrs. Dennis had limited experience with horses, having ridden only twice as a young girl.  After petitioners started their horse breeding activity, Mrs. Dennis rarely rode any of their horses.

During high school Mr. Dennis worked at a supermarket and was quickly promoted.  Mr. Dennis initially performed clerical duties but soon assumed managerial duties, including closing the store and monitoring the safe, by his senior year.  Lewis & Coker Supermarkets, Inc. (Lewis & Coker), a family-owned supermarket company, hired Mr. Dennis as a manager trainee 6 months after his high school graduation.  He quickly advanced and soon assumed statewide managerial responsibilities.  As a part of those responsibilities, Mr. Dennis traveled throughout Texas, evaluating the failing supermarkets, devising solutions for them or winding down a closing store's affairs, and assessing the closed store's accounts, including its inventory, profits, and losses.  In 1982 Mr. Dennis stopped traveling and became the manager of a Lewis & Coker grocery store on Memorial Drive in

Houston, Texas. Mr. Dennis continued in that position until Lewis & Coker encountered financial difficulties in 1990 and filed for bankruptcy in 1993. After filing for bankruptcy, Lewis & Coker's board of directors removed the chief executive officer for mismanagement of company finances. The board then appointed Mr. Dennis as Lewis & Coker's president with the promise to give him a grocery store as compensation if he managed the company during the bankruptcy. As Lewis & Coker's president, Mr. Dennis took a salary reduction to conserve funds to pay the company's attorney and reduced its debt from $1,300,000 to $600,000. Unfortunately, Lewis & Coker did not survive the bankruptcy, nor did Mr. Dennis receive a store. Faced with starting over upon the company's bankruptcy in 1995, Mr. Dennis accepted a part-time job assisting his friend to "redo" his convenience store and received a wage of $10 per hour. Over the next few years Mr. Dennis researched and reviewed his options, and in 1999 he decided to start a horse breeding activity.

Before the commencement of the horse breeding activity, Mrs. Dennis did not have any experience breeding and raising horses. Mrs. Dennis focused on cosmetology beginning in high school and received a high school diploma. She attended college for a year and a half, working toward a teacher's certificate for cosmetology. Thereafter, Mrs. Dennis pursued a career in cosmetology. Mrs. Dennis now runs her own business that provides

cosmetology services to nursing home residents.  During the years at issue, her cosmetology business earned an adjusted gross income of $111,743 in 2001, $125,162 in 2002, and $202,209 in 2003.[4]

The Midway Purchase and the Construction

In 1991 petitioners purchased a 30-acre plot in a rural county, Midway, Texas (Midway property).  This property had a water well and an abandoned 90-foot train car, but it had no fences or any other buildings and improvements.  During his time in the grocery business, Mr. Dennis relaxed on the Midway property and sought refuge from his stressful job.  During the mid-1990s, Mr. and Mrs. Dennis acquired two horses that they kept on the Midway property.  Mr. Dennis had given Mrs. Dennis a horse for Valentine's Day and had received a horse as a birthday gift from his friend Bob Griffin.  Petitioners did not ride the horses, because Mrs. Dennis' horse was not broken[5] and Mr. Dennis' horse had laminitis[6] in the front foot.  Also, petitioners did not use those horses as breeding stock.  In 1996 or 1997 petitioners purchased an additional 30-acre plot

---

[4]These figures are based on the adjustments upon which the parties have agreed.

[5]Horse breaking refers to the process in which a horse is trained to be ridden by humans or harnessed for other activities.

[6]Laminitis is a disease that causes a horse's hooves to be inflamed.  See Webster's New World College Dictionary 803 (4th ed. 2008).

contiguous to their land.  Before that purchase, the additional parcel lacked an easement to any road.

Before 1995 petitioners lived in a suburb of Houston.  In 1995 petitioners moved to the Midway property and converted the abandoned train car into their residence.  Mr. Dennis removed all the train seats, built an annexed kitchen, and added two used "double-wide" trailers he had renovated.  Over the years, including the years at issue, Mr. Dennis was personally involved in the daily operation of the Midway property and performed all the labor to cultivate the land and erect structures.  He planted grass; built five-strand barbed wire fences; constructed several barns, several horse arenas, fences, and gates; and placed ponds and water troughs on their land.  His efforts served several important purposes:  The cultivation of the Midway property provided pastures where all of petitioners' horses--as many as 46 horses at one time--could graze, a barn housed those horses, and several horse arenas provided a safe area where they could be trained.

The Horse Breeding and Training Activity

By 1999 petitioners had decided to breed, raise, and sell horses.  Mr. Dennis had no other employment and devoted all his time and attention to this activity.  From March 15 to December 11, 1999, petitioners acquired eight registered quarter horses-- one stallion and seven mares--from Triple T Horse Farms.

To conduct this activity, Mr. Dennis had acquired knowledge from his reading of horse magazines and all of John Lyons' books. John Lyons is an expert on how to train, care for, and breed horses. Mr. Dennis also sought advice from several individuals, including Rick Doyle, who worked at Triple T Horse Farms. Mr. Doyle's practice was to purchase the cheapest horse suitable for his purposes and sell it after training that horse for only 4 to 5 days. Mr. Dennis also sought advice from Mr. Griffin, who operated under a business plan substantially different from Mr. Doyle's. Mr. Griffin had successfully trained and broken horses and had a history of his horses and mules winning prizes at livestock competitions. Mr. Dennis met Mr. Griffin in 1984 when Mr. Griffin's construction company refurbished the Lewis & Coker store on Memorial Drive. They became neighbors soon after Mr. Dennis purchased the Midway property, which was a few miles from Mr. Griffin's property. Their proximity and friendship allowed them to exchange encyclopedic information about horse training, but Mr. Griffin died in 1998, before petitioners' commencement of their horse breeding activity. Mr. Dennis also reviewed the business model of Johnny Higgins. Although Mr. Higgins focused on training his horses to compete in races, he rendered valuable general training advice to petitioners.

Mr. Dennis evaluated and considered several business models and decided upon a breeding program. He planned to raise only

horses that he had produced from his horse breeding activity, distinguishing his operation from Mr. Doyle's. Mr. Dennis compared the selling price of horses with unknown blood lines, which ranged from $3,000 to $5,000, to the selling price of well-bred quarter and paint horses,[7] which ranged from $25,000 to $30,000. Additionally, a well-bred quarter horse that qualifies as a show horse could be sold for $50,000 to $100,000. To ensure a return on his horse investment, Mr. Dennis purchased horses accompanied with a certificate of registration documenting the horse's lineage and maintained that certificate of registration for his potential sale transactions of that horse or the foals[8] produced from that horse.

Once he began his horse breeding activity, he used two veterinarians, Dr. Posey and Dr. Craven, to gain medical information and practical experience. Mr. Dennis immediately recognized that the routine veterinarians' visits were costly. Each trimming of a horse's hooves cost $30 to $35, and maintaining the horseshoes cost $65 to $80 per horse. Also, after a short time he realized that he would have to weigh the cost of the veterinary service against its effectiveness and make

---

[7]According to Webster's New World College Dictionary 1174 (4th ed. 2008), a quarter horse belongs to a certain breed of light muscular horse of a solid, usually dark color. Because of their quick reactions quarter horses are used in Western range work and in rodeo.

[8]The word "foal" refers to a horse youngling that is usually less than 1 year old.

the difficult decision to forgo any costly service that would provide ineffective treatment to his horses. For example, the treatment of colic[9] cost $6,000 to $12,000, yet it had a low success rate. After deciding that the exorbitant cost of the colic treatment would outweigh the value of that horse and the success rate of such treatment, Mr. Dennis would deny his horse the medical treatment for colic.

Mr. Dennis also studied and learned how to facilitate every part of the breeding process beginning with the initial act of insemination, followed by the gestation of a foal, which lasted for 340 days from the date of conception, and ending with the delivery of the foal. Using his own research and what he had learned from the veterinarians, he bred his own horses and delivered their foals. Instead of using the pasture method, Mr. Dennis selected the hand-breeding method to ensure successful impregnation. To execute this method, he gained the skills to coordinate the stallion's impregnation of the mare. Mr. Dennis also delivered the foals with his own hands. Mr. Dennis had a successful breeding program in which he delivered approximately 25 to 30 foals. His mares and stallion produced all but two of those

---

[9]Colic is a medical condition commonly referred to as the "twisted gut". A horse with colic experienced abdominal pain, because a portion of the horse's intestine has been displaced or moved into an abnormal position in the abdomen, causing blockage of the digestive process.

foals.  He had purchased two already-impregnated mares.  He acquired and developed an advanced set of skills to assist a mare in the delivery of a healthy foal.  This hand-delivering method allowed him to manage any complications that could endanger the lives of a foal and a mare during the birth of the foal.  Mr. Dennis' skills became critical when the foal was breeched, entering the birth canal buttocks or feet first.  A breech birth could endanger a foal's life, because the umbilical cord could get wrapped around its neck causing strangulation and causing damage to the mare's cervix, preventing her from having other foals. These acquired skills enabled Mr. Dennis to reposition the foal during its birth, so that the foal's head would come out first and thus substantially increased the chance of the foal's survival.

Mr. Dennis instituted a training program and followed Mr. Doyle's advice regarding the breaking of his horses and invested most of his days in acquiring the skill of breaking horses.  Mr. Dennis believed that seeing a gentle horse would persuade prospective buyers to inspect his other inventory and ultimately purchase a horse.  Under the guidance of such experts as Mr. Griffin and the Turpin family, Mr. Dennis trained in the art of breaking horses.  The Turpin family, consisting of a father and his two sons, had worked all their lives on ranches.  Mr. Dennis paid them a salary and provided them with housing on the Midway

property in exchange for their labor and their personal instruction on how to break horses.

The breaking process requires intense effort and therefore required Mr. Dennis to devote much of his time to breaking his stock. This process is initiated about 6 months after the mare has given birth to a foal. Mr. Dennis would spend days rubbing the 6-month-old foal all over to familiarize it with human scent. After some time, he would place a halter on the foal and lead it, and teach that foal how to respond to hand and voice commands. As that horse grew older, Mr. Dennis continued its training in the horse arenas he had built. Most of the breaking process occurred in the arenas. Seldom did Mr. Dennis or Mrs. Dennis ride the horses.

On the basis of the 340-day gestation cycle and breaking process, Mr. Dennis estimated that a horse would be marketable when it was 3 to 4 years old. After the horse had completed its training, he used various means of advertisement to sell it. Mr. Dennis entered his horses into a trail ride where a group of people would ride his horses from South Texas to the Fat Stock Show and Exposition, which is commonly known as the "Rodeo". These trail rides would cover several hundred miles and last at least 10 days. To advertise their horses petitioners had T-shirts and hats produced so that their riders could wear them during the trail rides. Mr. Dennis also registered his horses in roping

shows to showcase their breeding and training.  Neither petitioner participated in the roping shows or the trail rides.

During the tax years at issue petitioners engaged in two activities:  The horse breeding activity and a cosmetology business.  Petitioners used the same accounting software program, Quickbooks, for the cosmetology business and the horse breeding activity.  This computer program assisted them in tracking their expenses and generating charts illustrating their expenses.  They had separate accounts for the cosmetology business and the horse breeding activity and separated those accounts from other accounts.  Petitioners kept better records for their horse breeding activity than for their cosmetology business.  They were able to differentiate their other expenses from their horse breeding activity expenses.  Petitioners hired a certified public accountant, Lawrence Hoole, to prepare their tax returns for the tax years 2002 and 2003.  Mr. Hoole often provided them advice relating to Mrs. Dennis' cosmetology business.

In addition to the horse stock on the Midway property, Mr. Dennis kept llamas to keep the predators, including wolves and coyotes, away from the horses.

The Drought, a New Line of Business, and an Alternative Source of Feed

During the years at issue a large portion of Texas had experienced a drought and the Midway property suffered from the drought beginning in 2002 and extending through 2004.  This

drought forced Mr. Dennis to modify his original business plan. At first petitioners thought that the drought was temporary and relied on the local feed store to provide the custom square bales of hay which they were then unable to grow on the parched land. Mr. Dennis estimated that the cost of hay processed in custom square bales to feed up to 46 horses would be $18,000 to $20,000 annually.  The drought continued with no end in sight.  Faced with the high cost of custom square bales of hay for his horses and observing the drought's effects on his pastures, Mr. Dennis recognized that a business opportunity was available and pursued it.  Mr. Dennis entered into a custom hay baling agreement with other farmers.  The agreement required Mr. Dennis to provide equipment used to cut and bale the hay while his partners provided the acres of land and fertilizer to grow the hay.  In 2002 Mr. Dennis purchased a tractor for $60,000, a baler for $30,000, a cutter for $8,500, and a speciality square baler for $8,900.  Mr. Dennis sought assistance from Mr. Higgins who had experience in the custom square baling business.  Mr. Dennis viewed the custom hay baling operation as an alternative source of feed and as a potential supplement to his income.  After feeding his horses, he sold the remaining bales of hay.  However, he soon realized that the custom hay baling operation was not profitable even though the hay price was inflated by the drought.  Each bale of hay sold for only $15 to $16.  Mr. Dennis terminated that agreement and was not

able to recover the equipment investment during the years at issue.

The Losses

Petitioners were not successful at selling their well-bred horses. Mr. Dennis' plan required 3 to 4 years for a horse to be bred and trained. Under his plan, the first marketable group of foals would not be available until 2002 at the earliest. In 2001 petitioners sold one of their purchased horses, "Black Beuty", at a loss of $1,843. For the tax years 2001, 2002, and 2003 petitioners incurred losses of $78,521, $89,054, and $125,801, respectively, from their horse breeding activity. Beginning in 2002 their expenses increased because Mr. Dennis commenced and operated a custom hay baling business to generate food for his horses during a drought and to provide supplemental income to compensate for his losses. The horse breeding activity had also incurred losses in the previous years, especially 1999 when petitioners purchased the original breeding stock.

To feed the horses and pay other expenses incurred in their horse breeding activity, petitioners borrowed an amount of money not specified in the record from Mrs. Dennis' mother and $100,000 from Mrs. Dennis' sister. Consequently, Mrs. Dennis' sister has a lien on petitioners' land.

After facing such accumulated unexpected expenses caused by the drought and other challenges, petitioners decided to terminate

their horse breeding activity.  They anticipate selling all their horses.  However, petitioners do not have plans to sell their land.

OPINION

The Court must decide whether petitioners engaged in the horse breeding activity with the intent of making a profit within the meaning of section 183.  A taxpayer who carries on a trade or business may deduct ordinary and necessary expenses incurred in connection with the operation of the business.  Sec. 162(a).  Section 183 disallows certain deductions attributable to an activity not engaged in for profit.  Section 183(c) defines an activity not engaged in for profit as any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

Breeding and raising horses may be an activity entered into for profit pursuant to section 162.  See Engdahl v. Commissioner, 72 T.C. 659, 665 (1979).  Such a determination will depend upon whether an individual engaged in the activity with the primary purpose of making a profit.  See id. at 666; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); Jasionowski v. Commissioner, 66 T.C. 312, 319 (1976).  A taxpayer's expectation of profit need not be reasonable.  See sec. 1.183-2(a), Income Tax Regs.; see also Engdahl v. Commissioner,

supra at 666; Feldman v. Commissioner, T.C. Memo. 1986-287. Nonetheless, a taxpayer must establish that he has continued his pursuit with the objective of making a profit. See sec. 1.183-2(a), Income Tax Regs.; see also Engdahl v. Commissioner, supra at 666; Feldman v. Commissioner, supra.

The Court must consider all facts and circumstances in the determination of whether a taxpayer has a profit objective. See sec. 1.183-2(b), Income Tax Regs. Section 1.183-2(b), Income Tax Regs., enumerates nine factors: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of personal pleasure or recreation. No one factor nor a majority of factors necessarily determines the outcome. A court may consider other factors in this determination. See id. Objective facts bear greater importance than a taxpayer's mere statement of his intent. See sec. 1.183-2(a), Income Tax Regs.

On the facts of these cases, the Court holds that petitioners engaged in the horse breeding activity with a profit objective despite their failure to secure any such profit.  Therefore, petitioners are entitled to deduct their losses for the tax years 2001, 2002, and 2003.

Manner in Which the Taxpayers Carried On the Activity

The Court must first examine the manner in which petitioners carried on their horse breeding activity.  The fact that a taxpayer carries on an activity in a businesslike manner may indicate a profit objective.  See sec. 1.183-2(b)(1), Income Tax Regs.  Courts review a taxpayer's business plan, books and records, abandonment of unprofitable techniques and adaptation of new techniques, and means of advertisement to determine whether the taxpayer carried on the activity in a businesslike manner.  See id.; see also Golanty v. Commissioner, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Dodge v. Commissioner, T.C. Memo. 1998-89, affd. without published opinion 188 F.3d 507 (6th Cir. 1999); Burger v. Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355 (7th Cir. 1987).

Having a business plan may suggest that a taxpayer conducted the activity in a businesslike manner.  See Sanders v. Commissioner, T.C. Memo. 1999-208; Dodge v. Commissioner, supra; Phillips v. Commissioner, T.C. Memo. 1997-128.  A business plan need not be written or oral; it can be evidenced by a taxpayer's

actions.  See Lundquist v. Commissioner, T.C. Memo. 1999-83, affd. without published opinion 211 F.3d 600 (11th Cir. 2000); Phillips v. Commissioner, supra.

Petitioners concede that they did not have a formal plan. Nonetheless, the Court infers from their actions that they did have a business plan.  Mr. Dennis effected a business strategy based upon breaking well-bred horses and forecasted that a horse would become marketable after a 3-year period of nurture and training.  Contrary to respondent's argument that characterizes Mr. Dennis' plan as an abstract one, he personally executed every detail of his plan:  He cultivated the land so that 46 horses could graze, maintained that pastureland, constructed barns to house his horses and several horse arenas where he could break and train his horses, learned how to break and train his horses so that he could advertise them as gentle and well-bred and ultimately, sell them, and found an alternative feeding source when his pastureland dried up as an effect of the drought.

In addition, maintaining complete and accurate books and records may indicate that a taxpayer has engaged in an activity for profit.  See sec. 1.183-2(b)(1), Income Tax Regs.  The commingling of personal and business funds would signify that a taxpayer did not conduct his activity in a businesslike manner. See Ballich v. Commissioner, T.C. Memo. 1978-497.  A taxpayer's books and records must serve a cost-effective purpose beyond the

task of tax preparation. See Burger v. Commissioner, supra. His books and records must facilitate a periodic determination of profitability and an expense analysis that may be used to implement cost-saving measures timely and efficiently. See Golanty v. Commissioner, supra at 431; Burger v. Commissioner, supra. A taxpayer need not maintain a sophisticated cost accounting system. He must institute "the usage of cost accounting techniques that, at a minimum, provide the entrepreneur with the information he requires to make informed business decisions." Burger v. Commissioner, supra. In Burger, this Court explained: "Without such a basis for decisions affecting the enterprise, the incidence of a profit in any given period would be a wholly fortuitous result." See id. In its review of the Tax Court's Burger decision, the U.S. Court of Appeals for the Seventh Circuit stated that a taxpayer should not limit his cost accounting technique to recording expenses per animal. See Burger v. Commissioner, 809 F.2d at 359. A taxpayer may be expected to implement effective methods to control and monitor costs, such as monthly expense reports and income projections. See Engdahl v. Commissioner, 72 T.C. 659 (1979); Burger v. Commissioner, T.C. Memo. 1985-523.

Petitioners maintained some financial records and books for their horse breeding activity, and they used accounting software to categorize their expenses and organize that information.

Petitioners separated their business and personal accounts and, in addition, had different accounts for each of the businesses. They maintained their horse breeding activity's business records far better than those of their hairstyling business, which the IRS found to be a business.

However, respondent contends that petitioners did not keep the records necessary to create and implement any cost-saving strategy and kept those records only for the purpose of tax preparation. Petitioners did not record the expenses per horse. However, this Court is satisfied that their records were adequate to keep track of the activity. See Helmick v. Commissioner, T.C. Memo. 2009-220. Petitioners' rudimentary record system allowed them to assess their horse breeding activity's economic performance and identify any cost-reducing strategy. Mrs. Dennis testified that the Quickbooks program allowed them to categorize their horse breeding activity expenses and generate the profit and loss statements, which were later used to file their taxes. Their record system further allowed them to identify the escalating veterinary expenses and prescribed a cost-reducing strategy. In the beginning of their horse breeding activity, Mr. Dennis could pinpoint immediately that the weekly cost of the trimming of the horses' hooves and the necessary inoculations added up to a substantial sum. In an effort to reduce the accumulating veterinary costs, he acquired the skills to trim the horses'

hooves, personally administered inoculations, and denied ineffective and expensive colic treatment to his dying horses. Respondent agreed that Mr. Dennis' actions would reduce the veterinary costs, and the record confirms that petitioners' efforts were successful. Mr. Dennis reduced the $9,682 of veterinary and horse care expenses in 2001 by 67 percent (to $3,180) for the tax year 2002 and 53 percent (to $4,541) for the tax year 2003.

Mr. Dennis implemented the same effective cost analysis to evaluate and to terminate his supplementary hay activity. He entered into a custom hay baling agreement in order to defray the escalating feed cost. Respondent contends that Mr. Dennis conducted a cost analysis only after he executed the agreement, and therefore his cost analysis would not have been effective since each custom square bale of hay was sold at $15 or $16. However, respondent did not consider the fact that Mr. Dennis took into account that the cost of custom square bales needed to feed 46 horses would be $18,000 to $20,000 per year. Mr. Dennis later terminated the agreement because, even with consideration of the high cost of feeding his horses, the actual amount of hay sold during 2003 was so low that it would not generate an ultimate return on his equipment purchase. Therefore, this Court concludes that petitioners used their books and records not only for tax

preparation, but also for identifying and implementing cost-saving strategies and attempting to foster profitability.

A taxpayer may further exhibit his profit objective in the manner in which he advertises his business. A single form of substantial advertisement itself may not establish that a taxpayer has carried on his activity in a businesslike manner. See McKeever v. Commissioner, T.C. Memo. 2000-288; Cohn v. Commissioner, T.C. Memo. 1983-301, affd. 742 F.2d 1432 (2d Cir. 1984). Different kinds of advertising media may allow the taxpayer "to expand [his] potential market and to attract new individuals". Cohn v. Commissioner, supra; see also Miller v. Commissioner, T.C. Memo. 2008-224. Horse shows may be an effective advertising method. See Engdahl v. Commissioner, supra at 662-663; Dodge v. Commissioner, T.C. Memo. 1998-89.

Petitioners' different methods of advertising demonstrated their profit objective. Mr. Dennis often permitted his horses to be used on 10-day trail rides starting from South Texas and ending at the Fat Stock Show in either Dallas or Houston. To advertise his horses petitioners purchased promotional clothing and hats and distributed them to those who rode his horses during the trail rides. Mr. Dennis targeted another segment of potential buyers when he entered his horses in the roping shows. The trail rides and the roping shows serve as two different forums to promote his

horses' gentleness and their ability to be controlled by any potential owner.

A taxpayer's change of operating methods, adoption of new techniques, or abandonment of unprofitable methods may indicate a profit objective. Sec. 1.183-1(b)(1), Income Tax Regs.; see also Golanty v. Commissioner, 72 T.C. at 430-431. Petitioners' change of operating methods and abandonment of unprofitable methods evidence their profit objective. Mr. Dennis provided credible testimony as to how he changed his method of caring for his horses. He learned how to care for his horses himself and thus reduced his veterinary expenses. He listed the cost of each of the veterinary services and calculated the cost-reducing effect of performing the veterinary services himself. As stated before, he succeeded in reducing the veterinary costs for the later years of the horse breeding activity.

Mr. Dennis also testified to his determination to enter into and his decision to abandon the custom hay baling agreement. Mr. Dennis' original business plan involved the cultivation of the nonarable land into pastureland, on which his horses would graze. The drought threatened this part of his plan. From the tax year 2001 to the tax year 2002, Mr. Dennis' feeding costs almost doubled. His intent in entering into a custom hay baling agreement was to reduce the escalating cost of hay and possibly to increase profit derived from the horse breeding activity. Mr.

Dennis bought the least expensive equipment to bale the hay while using his partner's land to grow the hay. He expected that starting a custom hay baling business would increase the earnings from the horse breeding activity. However, Mr. Dennis soon realized that he could not sell enough square bales of hay to recover the cost of his equipment. Although Mr. Dennis' initial plan reduced his feeding costs, he did not recover his equipment expenses, and his abandonment of his custom hay baling business prevented those costs from escalating further.

This Court considers this factor--the manner in which the activity is conducted--to be mixed. However, overall, this factor favors the Dennises, indicating that they had the requisite profit objective.

Expertise of Taxpayers or Their Advisers

Preparation for the activity by extensive study of its accepted business, economic, and scientific practices or consultation with industry experts may indicate a profit objective where a taxpayer carries on the activity in accordance with such practices. See sec. 1.183-2(b)(2), Income Tax Regs. A taxpayer does not have to pursue a formal market study; nevertheless, his failure to investigate the most basic facts affecting profit may indicate an absence of a profit objective. See Engdahl v. Commissioner, 72 T.C. at 668; Golanty v. Commissioner, supra at 432; Burger v. Commissioner, T.C. Memo. 1985-523. A taxpayer may

be expected to seek an expert's advice or develop his own understanding of what his "ultimate costs might be, how [he] might operate at the greatest cost efficiency, how much revenues [he] could expect or what risks could impair the generation of revenues." Burger v. Commissioner, T.C. Memo. 1985-523.

Mr. Dennis sought advice from Mr. Hoole, Mr. Griffin, Mr. Higgins, and Mr. Doyle. The record does not indicate that Mr. Griffin or Mr. Higgins provided any economic advice. Mr. Griffin and Mr. Higgins had horse training experience. Mr. Hoole only rendered advice relating to petitioners' tax returns. However, Mr. Doyle provided important business advice. Mr. Doyle laid out a business model contemplating that a horse seller would purchase the cheapest horse at the auction house, break that horse within a few days, and immediately thereafter sell it for approximately $3,000 to $5,000. Mr. Doyle's business plan informed Mr. Dennis' own business model of breeding, breaking, and selling horses with "good bloodlines". Mr. Dennis estimated that a well-bred horse would yield approximately six to eight times more than the sale of Mr. Doyle's typical horses. Mr. Dennis estimated that well-broken and well-bred horses would be sold at $25,000 to $30,000. Although Mr. Dennis did not follow Mr. Doyle's plan exactly, his improvement upon Mr. Doyle's plan still indicates his profit objective.

Although Mr. Dennis was raised in a rural area, he did not have any experience with breeding, raising, or selling horses. Neither did Mrs. Dennis. Despite his lack of knowledge, Mr. Dennis learned to provide veterinary care to his horses, break and train his horses, and deliver foals. The Court observed in Easter v. Commissioner, T.C. Memo. 1992-188, that performing various tasks to save money did not indicate that a taxpayer studied the business aspect of the activity. In Easter, a taxpayer learned how to worm the horses, trim their hooves, and suture their cuts for the sole purpose of saving money. This Court distinguishes the present case from Easter, because Mr. Dennis studied the business aspect of the horse breeding activity and developed a plan. Mr. Dennis took each calculated step, including the development of the veterinary and training skills, in the effort to actuate his business model, which required a 3-to-4-year period to breed and train a horse to be sold at a profit.

This factor supports a finding that petitioners had a profit objective.

Taxpayers' Personal Motives

Having personal motives in carrying on the activity may indicate that a taxpayer did not engage in this activity for profit, especially where recreational elements exist. See sec. 1.183-2(b)(9), Income Tax Regs. Such personal pleasure will not cause the taxpayer's activity to be classified as a hobby if the

activity is in fact engaged in for profit as evidenced by other facts. See id.

Respondent argues that Mr. Dennis chose this lifestyle, used the farm as a means to escape his business life, and selected friends on the basis of the horse breeding activity. The Court disagrees. At first, Mr. Dennis might have chosen the undeveloped property as a refuge from his business life; however, he turned that refuge into a place of business. The Court recognizes that even during the period of his unemployment he worked when he arrived on the property and sought others as a source of information regarding how to set up a horse breeding business. His friendships were helpful to his horse breeding and selling activity. Mr. Higgins taught him how to cultivate and bale the hay, and Mr. Griffin showed him how horses were sold and which horses were valuable.

Respondent argues that Mr. and Mrs. Dennis love animals and their love was the primary motive underlying these activities. However, petitioners seldom rode any of the horses. Petitioners did not participate in either the trail rides or the roping shows. Moreover, caring for their horses demanded a rigorous work schedule of rising early to feed the animals, staying up all night to monitor horses ready to give birth or to die, and cleaning their barns. Such laborious activities could not be considered pleasurable. See Engdahl v. Commissioner, supra at 670.

Petitioners' treatment of their horses also indicated their business objective. Mr. Dennis treated his horses like inventory. He withheld medical treatment from a horse dying from colic after he decided that the high cost of the medical procedure and its ineffectiveness outweighed the value of that horse's life. The other animals to which respondent referred served a certain purpose. For example, the llamas kept predators away from the horses. Even if petitioners did have an abstract love for animals, it does not necessarily follow that they conducted their horse breeding activity for pleasure rather than profit. See Davis v. Commissioner, T.C. Memo. 2000-101; Harvey v. Commissioner, T.C. Memo. 1988-13. Last, respondent argues that petitioners' kind treatment and care for their horses indicated their personal devotion as pet owners rather than as horse trainers and sellers. On the contrary, petitioners' care and training of the horses would be instrumental to the process of acclimating the horses to human smells and voices so as to carry out petitioners' plan to market them as gentle animals.

This Court finds that this factor supports petitioners.

The Time and Effort Expended by Taxpayers

A taxpayer's amount of time and effort spent on the activity may substantiate his profit objective. The fact that the taxpayer devotes much of his personal time and effort to carrying on the activity, particularly if the activity does not have substantial

personal recreational aspects, may indicate an intention to make a profit. Sec. 1.183-1(b)(3), Income Tax Regs. Respondent conceded that Mr. Dennis had dedicated a substantial amount of his time to this activity. Nonetheless, respondent attempted to discount the value of Mr. Dennis' time and effort. Respondent argued that most of Mr. Dennis' time and effort had been focused on the upkeep of his homestead and his unemployment had permitted Mr. Dennis to attend to these chores. The Court disagrees. The construction and upkeep of the barns, the horse arenas, and the pastureland provide housing, training, and food for the horses. This Court finds that his substantial time and effort dedicated to raising and breeding horses support the conclusion that he engaged in the activity with the requisite objective of earning profit.

Petitioners established, through credible testimony, that they contributed vast amounts of time to their horse breeding activity. Petitioners did not spend time riding their horses or attending horse shows. Petitioners spent their time meeting the grueling and strenuous demands of hand-breeding their horses, feeding their horses, caring for sick horses, assisting their mares to give birth to their foals, and grooming, taming and training their horses. These demands required Mr. and Mrs. Dennis to attend to them morning, day, and night. In addition, Mr. Dennis dedicated much of his time to maintaining their pastureland so that horses could have a feed source, cleaning barns, breaking

his horses in arenas he built, and learning how to provide veterinary care. Petitioners did not complete these tasks for their personal pleasure. In fact, they spent their time and effort trying to reduce costs.

For example, when the drought forced petitioners to use a substantially more expensive source of horse feed, Mr. Dennis attempted to secure a long-term source of quality hay even if that business venture did not prove profitable. Also, Mr. Dennis reduced the cost of veterinary services by learning how to administer daily veterinary care. Petitioners managed to reduce their expenses by dedicating their own time and effort to maintaining their pastureland, their farm, and their horses.

This factor strongly favors petitioners.

The Expectation That Assets May Appreciate in Value

The word "profit" can encompass appreciation in the value of assets, such as land, used in the taxpayer's activity. See sec. 1.183-2(b)(4), Income Tax Regs. Even if no profit is derived from the current operation, a taxpayer may intend that an overall profit will result when appreciation in the value of the land used in the activity is realized because income from the activity together with the appreciation of land will exceed the operation's expenses.

Mr. Dennis expected that the land would appreciate. He cultivated the land substantially and erected barns, horse arenas,

gates, and fences on the land.  Having this expectation, he used the land as collateral for a loan.  However, he does not intend to sell the land to offset the losses his horse breeding activity incurred.

Although this factor indicates that petitioners lacked a profit objective, one factor cannot alone determine the outcome. See sec. 1.183-2(b), Income Tax Regs.; see also Miller v. Commissioner, T.C. Memo. 2008-224.

Taxpayers' Success in Carrying On Other Similar or Dissimilar Activities

The fact that a taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable.  See sec. 1.183-2(b)(5), Income Tax Regs.  In addition, a taxpayer's successes in other unrelated activities may help to demonstrate that his present objective is profit.  See Rabinowitz v. Commissioner, T.C. Memo. 2005-188; Daugherty v. Commissioner, T.C. Memo. 1983-188.  A court can infer that a taxpayer's diligence, initiative, foresight, and other qualities will generally lead to success in other business activities if he has demonstrated those qualities by starting his own business and turning that business into a relatively large and profitable enterprise.  See Daugherty v. Commissioner, supra.

Respondent urges the Court to make a comparison between Mr. Dennis' cattle operation and his horse breeding activity. The Court cannot do so, because the record does not provide any facts relating to Mr. Dennis' cattle operation. Furthermore, the Court cannot compare Mr. Dennis' employment at Lewis & Coker with his commencement and operation of a "business" of his own.

This factor is neutral.

Taxpayers' History of Income or Loss

Next, the Court will examine petitioners' history of income or loss. A history of substantial losses may indicate that the taxpayer did not conduct the activity for profit. See Golanty v. Commissioner, 72 T.C. at 427; see also sec. 1.183-2(b)(6), Income Tax Regs. A series of losses during the initial or startup phase of an activity may not necessarily indicate that the activity is not engaged in for profit. See sec. 1.183-2(b)(6), Income Tax Regs. Where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status, such continued losses, if not explainable as due to customary business risks or reverses, may indicate that the activity is not being engaged in for profit. See id.

Petitioners commenced their horse breeding activity in 1999. Each year from 1999 through 2004 petitioners made no profits and incurred substantial losses. In 2001 Mr. Dennis sold only one horse, and it was at a loss. Petitioners' losses during these

early years of their operation are attributable to the startup phase of their activity.  The startup phase of a breeding operation may last 5 to 10 years.  See Engdahl v. Commissioner, 72 T.C. at 669.  The substantial losses incurred in the tax years at issue have fallen within the startup period and do not indicate that petitioners did not have profit objective while pursuing this activity.

The drought during tax years 2002 to 2004 had inflated petitioners' costs of feeding as many as 46 horses.  This Court finds Mr. Dennis' testimony credible as to the duration of the drought and its devastating effects on petitioners' horse breeding activity.  The Court will not consider such losses arising from unforeseen or deleterious events as an indication that their activity was a hobby because such circumstances lie beyond petitioners' control.  See sec. 1.183-2(b)(6), Income Tax Regs.

This factor then remains neutral.

Taxpayers' Financial Status

Other substantial sources of income or capital may indicate that a taxpayer does not engage in an activity for profit, especially if personal or recreational elements are involved.  See sec. 1.183-2(b)(8), Income Tax Regs.; see also Rozzano v. Commissioner, T.C. Memo. 2007-177; Phillips v. Commissioner, T.C. Memo. 1997-128.  Tax benefits resulting from the activity do not compel a conclusion that a taxpayer engaged in an activity without

a profit objective.  See Engdahl v. Commissioner, supra at 670; McKeever v. Commissioner, T.C. Memo. 2000-288.  Instead, a court should only take that fact into consideration.  See Engdahl v. Commissioner, supra at 670.  More importantly, the inquiry should be focused upon whether petitioners have a genuine profit objective.  See id.

Petitioners had limited income sources on the date they commenced their operation.  For the tax years at issue Mr. Dennis did not have any employment other than the horse breeding activity.  Although Mr. Dennis did receive some government benefit income, the insignificant dollar amount could not have offset the significant amount of his operation's losses.

Respondent argued that petitioners had other sources of income, including the revenues from Mrs. Dennis' business, their property, and loans from her family.  Mr. Dennis testified that he will not sell his property, and respondent acknowledged this fact in his brief.  The land serves as the sole collateral for petitioners' debt.  Respondent also argued that petitioners received money from Mrs. Dennis' mother and sister.  The record indicated that petitioners borrowed money from Mrs. Dennis' sister, who now has a lien on the land.  However, the record does not indicate the amount of money provided by Mrs. Dennis' mother, leaving the Court unable to evaluate this source of funds.  The

income derived from Mrs. Dennis' beauty salon remained the primary source of petitioners' income during the years at issue.

Petitioners could have applied losses from their horse breeding activity against the income from Mrs. Dennis' cosmetology business and thus realized tax benefits. However, overall, petitioners struggled financially to sustain themselves. The adjusted gross income of Mrs. Dennis' cosmetology business alone would not have been enough to pay their living costs along with the expenses of the horse breeding activity. Mrs. Dennis' business had $111,743 of adjusted gross income for tax year 2001, $125,162 for tax year 2002, and $202,209 for tax year 2003. Mr. Dennis reported losses of $89,570 on his activity for tax year 2001, $89,054 for tax year 2002, and $125,801 for tax year 2003. These figures indicate that the income from Mrs. Dennis' business could not have absorbed the losses Mr. Dennis' horse breeding activity incurred while paying petitioners' living costs. Petitioners faced economic hardship as a result of those losses. Furthermore, petitioners did not engage in this activity to create losses on paper; these losses were actual, depleting their available cash and savings. Depreciation accounted for only 9 percent ($7,666) of the expenses of the horse breeding activity in the tax year 2001, 35 percent ($35,072) of the expenses in the tax year 2002, and 19 percent ($19,881) of the expenses in the tax year 2003. These percentages indicate that most of petitioners'

horse breeding activity expenses were paid out of their own pockets. Therefore, the income derived from Mrs. Dennis' cosmetology business is not indicative that the horse breeding activity lacked a profit objective.

This factor favors petitioners.

Conclusion

Viewing the record as whole, this Court concludes that petitioners engaged in their horse breeding activity with a bona fide profit objective within the meaning of section 183. Therefore, petitioners can deduct the losses the parties have stipulated for the years at issue.

Because petitioners may deduct their losses for the years at issue pursuant to section 162, any issue of whether a penalty should be imposed under section 6662 as a result of petitioners' horse breeding activity for those years is moot.

Decision will be entered under Rule 155.